PAUL KIM (NY Bar No. 4235776)
Email: kimpa@sec.gov
TIMOTHY WORK (DC Bar No. 1016904)
Email: workt@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
Tel: (202) 551-8115

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> FRANK M. CERISANO, JR., <br><br> Defendant. | Case No. 2:26-cv-2444 <br><br> **COMPLAINT** <br><br> **Jury Trial Demanded** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## SUMMARY

1.     From at least May 2021 to April 2025 (the "relevant period"), Defendant Frank M. Cerisano, Jr. ("Cerisano" or "Defendant") engaged in a manipulative stock trading scheme known as spoofing. He placed non-bona fide "spoof" orders that he did not intend to execute for the purpose of manipulating stock prices, and also placed bona fide orders that he did execute at the resulting manipulated prices for a profit. By repeating this pattern Cerisano generated approximately $1,115,672 in ill-gotten gains.

1

2.    Cerisano's scheme involved trading securities during extended hours trading periods when fewer shares are traded as compared to regular market hours. This made it easier for Defendant to move the prices of securities in a direction of his choosing by rapidly placing non-bona fide "spoof" orders on one side of the market, then executing bona fide orders on the opposite side of the market at prices that reflected the artificial price movements he had created. After his bona fide orders were executed, Cerisano would quickly cancel his non-bona fide spoof orders. The practice of spoofing is recognized as an illegal, fraudulent scheme and a form of market manipulation.

3.    Cerisano's scheme also involved coordinated use of accounts at multiple broker-dealers. Typically he would enter the non-bona fide orders through one or more "helper" accounts and the profitable, bona fide orders through a "winner" account at a different broker-dealer. This had the effect of preventing the broker dealers where he maintained his accounts from detecting his unlawful, manipulative trading because none of them could see the full scope of his order activity.

4.    Cerisano knew or was reckless in not knowing that his spoofing was illegal. Prior to the relevant period, he conducted spoofing activity through a single account at one broker-dealer. After the broker-dealer detected this activity, one of its compliance officers contacted Cerisano, described in detail the prohibited spoofing activity, and informed Cerisano that further spoofing would result in closure of his account. After the broker-dealer detected Cerisano spoofing once again, it again described in detail the prohibited spoofing activity and informed Cerisano that spoofing would not be tolerated. After the third such occasion, the broker-dealer closed Cerisano's account. Cerisano then resumed his spoofing activity at other broker-dealers using the "helper-winner" structure described above.

5.    By engaging in the conduct alleged in this complaint, Defendant violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)], and Sections 9(a)(2) and 10(b) of the Securities Exchange Act of

1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(2) and 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]. The SEC seeks a permanent injunction, a conduct-based injunction, disgorgement of ill-gotten gains plus prejudgment interest, and a civil penalty against Cerisano.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7.      Defendant, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

8.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Cerisano resides in this district.

## THE DEFENDANT

9.      **Frank M. Cerisano, Jr.**, age 58, resides in Las Vegas, Nevada. Cerisano passed the FINRA Series 3, 7, 24, and 63 exams at various times from 1988 to 2001. He owned and operated a proprietary trading firm from at least 1998 to 2015 and had previously been employed by several FINRA-registered entities starting in 1987.

## TERMS USED IN THIS COMPLAINT

10.     *Spoofing* refers to a type of market manipulation scheme where a trader enters non-bona fide orders to create the false appearance of new or increased trading interest in a security. A spoofer's intent behind these non-bona fide orders is to move the security's market price for the spoofer's benefit.

11. *Layering* is a form of spoofing that involves entering multiple non-bona fide orders at multiple price tiers. In this complaint, "spoofing" and "layering" are used interchangeably.

12. *Regular market hours* refers to the core period of time when the U.S. securities markets are open: Monday through Friday, from 9:30 a.m. to 4:00 p.m. Eastern Time, with the exception of certain holidays. The U.S. securities markets also allow for *extended hours trading* during periods directly before the stock markets' regular hours sessions open and right after they close.  The duration of extended market hours varies per market.

13. *National Best Bid ("NBB")* is the highest reported price a buyer is willing to pay to buy a security.

14. *National Best Offer ("NBO")* is the lowest reported price that a seller is willing to accept to sell a security.

15. *NBBO.* The spread between the National Best Bid and the National Best Offer is referred to as the "NBBO." The NBBO is publicly reported to the market and represents the tightest bid-ask spread for a particular security.

16. *Midpoint.* The midpoint price of a security is defined as the average of the NBB and the NBO.

17. *Limit orders* are orders to buy or sell a security at a specified price or better and can only be executed if the market price reaches the limit price. A buy limit order can only be executed at the limit price or lower, and a sell limit order can only be executed at the limit price or higher. While limit orders do not guarantee execution, they help ensure that an investor does not pay more than or sell for less than a pre-determined price.

18. *Hidden orders* are orders to buy or sell a security that are visible to the person who entered the order, but invisible to all other market participants.

## THE ALLEGATIONS

**A.　Cerisano Was Warned Against Manipulative Trading**

19.　From no later than February 2021, Cerisano used an account he had at a registered broker-dealer, "BD 1," to trade equity securities from his home in Las Vegas. Cerisano typically entered hundreds or thousands of buy and sell orders every trading day.

20.　On February 24, 2021, Cerisano received an email from a compliance officer of BD 1. The email informed him that on the previous day, BD 1 had detected spoofing and layering activity in his account in the stock of Company A. The email referred Cerisano to an attached text file that defined "spoofing" as follows:

> Generally, spoofing is a form of market manipulation which involves placing certain non-bona fide order(s), usually inside the existing National Best Bid or Offer (NBBO), with the intention of triggering another market participant(s) to join or improve the NBBO, followed by canceling the non-bona fide order, and entering an order on the opposite side of the market.

The text file defined "layering" as follows:

> Layering involves the placement of multiple, non-bona fide, limit orders on one side of the market at various price levels at or away from the NBBO to create the appearance of a change in the levels of supply and demand, thereby artificially moving the price of the security. An order is then executed on the opposite side of the market at the artificially created price, and the non-bona fide orders are immediately cancelled.

21.　As explained in the February 24 email, Cerisano had entered a hidden limit order to buy 2000 shares of Company A at $56.02 per share the previous day. Subsequently, in the span of 55 seconds, he entered four short sale limit orders for Company A stock at four descending price tiers, starting at $56.38 and ending at $56.05 per share. As explained in one of the email attachments, "[t]his [sell order] activity accounted for a high of 84% of the shares quoted in the top 10 tiers of the sell side of the visible order book." The email then noted, correctly, that "[t]hroughout this time frame, the midpoint of the bid/ask decreased. Also, your hidden buy order was filled on 1295 shares," with the last execution taking place six seconds after his final

5

short sale order was entered. Two seconds later, Cerisano cancelled all four short sale orders.

22. All of Cerisano's trading activity described in the preceding paragraph took place before regular market hours. While Company A stock's trade volume during regular market hours was approximately 52.5 million shares, its trade volume during pre-market hours when Cerisano was trading was only about 2.9 million shares. Because Company A stock had less trading volume during pre-market hours, it had a wider NBBO spread than during regular market hours, and therefore was more susceptible to price manipulation through spoofing.

23. The February 24 email concluded: "The open hidden buy order, the routing of the short sales, the buy execution and the sell short cancellations are the basis of a layering event which is considered a manipulative trading practice by our regulators. Please refrain from this type of order routing activity. Repeated instances can result in account closure."

24. Cerisano understood "our regulators" in the February 24 email and in the compliance officer's subsequent emails to refer to Plaintiff Securities and Exchange Commission and FINRA.

25. On February 26, 2021, the same compliance officer informed Cerisano via email that his account had engaged in spoofing the previous day, this time in the stock of Company B. As set out in the email and its attachments, Cerisano's trading activity bore the same hallmarks of the activity highlighted in the February 24 email. During post-market hours, Cerisano had entered partially hidden buy limit orders at multiple price tiers, showing 200 shares at each tier but hiding thousands more. He then entered multiple, visible short sell limit orders for 17,000 shares each at four descending price tiers, each of which either created or joined a new national best offer. These sell orders accounted for 82% of the offers at those price tiers. The non-bona fide sell orders having manipulated Company B stock's midpoint towards his buy orders' price tiers, his buy orders filled on 9,200 shares. Following these executions, Cerisano

6

immediately cancelled his sell orders.

26. As with his trading in Company A stock, Cerisano's trading in Company B stock took place outside of regular market hours. While Company B stock's trade volume during regular market hours was approximately 390 million shares, its volume during post-market hours was only about 11.8 million shares. Because Company B stock experienced a smaller trade volume during pre-market hours, it had a wider NBBO spread than during regular market hours, and therefore was more susceptible to price manipulation through spoofing.

27. In his February 26 email, the compliance officer again explicitly noted for Cerisano the aspects of his trading activity that, taken together, amounted to intentional and unlawful market manipulation. These included the use of hidden orders, the creation of new inside bids or offers through visible orders on the other side of the market, large concentration bid or offered, and the mass cancellation of an offer (or bid) after a bid (or offer) was executed. The email concluded: "This type of trading activity cannot continue with our firm. Please be advised, another instance of this type of trading activity after 2/26/2021 will result in account closure."

28. On April 6, 2021, the same compliance officer informed Cerisano via email that his account had engaged in spoofing on March 30, 2021. As set out in the email and its attachments, Cerisano had once again entered a partially hidden buy limit order for a particular stock ticker; subsequently entered visible sell limit orders for the same ticker at decreasing price levels, comprising "near[ly] 100% of the size on the first 5 offer tiers"; and then cancelled his sell orders immediately after his buy orders were partially filled at a manipulated price. The April 6 email explained: "Our regulators would look at this as trying to use the large visible size on the offer to move the market toward the hidden bids for execution."

29. On May 7, 2021, the BD 1 compliance officer informed Cerisano via email that "[d]ue to repeated instances of layering," his account would "be set to closing transactions only and will be closed."

**B.      Cerisano Continued Manipulative Trading at Other Broker-Dealers**

30.      Due to the closure of his account at BD 1, Cerisano opened new accounts at three other broker-dealers on or about May 21, June 9, and June 19, 2021.

31.      Eventually, Cerisano opened four additional accounts, all at different brokerages.

32.      In addition to these seven accounts, Cerisano also maintained a pre-existing account at yet another brokerage firm.

33.      Taken together, the three accounts he opened in May and June 2021, the four accounts he subsequently opened, and the one pre-existing account are hereinafter referred to as the "new spoofing accounts."

34.      After he began trading in the new spoofing accounts, Cerisano continued trading in a manner similar to the manipulative trading he had conducted through BD 1. That is, he entered bona fide orders on one side of the market, then entered non-bona fide orders on the other side of the market at different price tiers—escalating prices for buy orders and descending prices for sell orders—which would move the subject stock's midpoint until other traders matched or improved on his non-bona fide orders, thus causing his orders on the other side of the market to be filled at a manipulated price. After those were filled, Cerisano immediately cancelled his non-bona fide orders.

35.      Cerisano would often profit from a completed spoofing transaction by manipulating the same stock's price, but in reverse. For example, if he purchased a stock after manipulating the price to an artificially low level, he would then sell the stock after manipulating its price to an artificially high level.

36.      There was one key difference between Cerisano's manipulative trading through BD 1 and his manipulative trading through the new spoofing accounts: Instead of conducting all of his spoofing activity through a single account, he typically used the "helper-winner" structure by dividing his trading activity between two or more accounts. Specifically, he would enter his non-bona fide orders through one or

two accounts (the helper accounts), and he would use one or two accounts at different broker-dealers (the winner accounts) to enter his bona fide orders to execute transactions at manipulated prices on the other side of the market.

37. Cerisano's choice of helper and winner accounts was not random; rather, it reflected his sophisticated knowledge of stock trading. His helper account for a given spoofing transaction was typically a professional trading account that allowed him to route his non-bona fide orders to a specific exchange, such that they would be visible to other traders and impact the NBBO. Meanwhile, the winner account was typically held at a retail brokerage. Here, orders were frequently internalized by the broker-dealer or by the third-party liquidity provider to which the broker-dealer routed the order, thus causing these orders to be hidden from other traders, not be posted on the market data feed, and have no impact on the NBBO. Moreover, because the "winner" orders would typically be internalized, Cerisano minimized the risk that his "helper" orders and "winner" orders would be matched.

38. Because each broker-dealer through which Cerisano traded could see his activity only on one side of the market, the "helper-winner" structure allowed Cerisano to continue spoofing without being detected by the broker-dealers where he maintained the new spoofing accounts.

39. Cerisano conducted the spoofing activity described in ¶¶ 34-35 from his home in Las Vegas. This trading took place via interstate wires and through the facilities of national securities exchanges.

40. On July 26, 2021, Cerisano emailed a representative of BD 1 when he was attempting to reopen his account that was previously closed for spoofing: "I really Feel that My Account never should have been Closed, anyway the reason the Account was Closed was because of Layering, an easy way around this would be if the system only let Me put orders in on one side of the Market Meaning I Could only bid or offer but not both, this would take Care of the problem please advise thanks .. [sic]"

41. Cerisano's request to open an account that would only allow him to enter

orders on one side of the market was an attempt to open another account that he could incorporate into the "helper-winner" structure of his spoofing scheme.

42. Cerisano facilitated spoofing in the new spoofing accounts by conducting such trading outside of regular market hours when stocks were traded at lower volumes, making their prices easier to manipulate due to larger NBBO spreads.

43. On at least one occasion, in October 2024, after a broker-dealer pointed out Cerisano's suspicious trading and he responded with an unconvincing explanation of his activity, the broker-dealer prohibited Cerisano from trading in his account during pre- and post-market hours. About ten minutes after the broker-dealer's representative informed Cerisano of this restriction, Cerisano demanded that his account be closed and that his capital be wired to another brokerage firm. This reaction shows how important it was to Cerisano's manipulative trading strategy to be able to trade outside of regular market hours.

**C. Detailed Examples of Defendant's Spoofing Activity**

44. One example of the spoofing activity that Cerisano conducted in the new spoofing accounts took place during post-market trading hours on January 10, 2025. On that day, Cerisano manipulated the shares of a mid-cap exchange-traded fund (the "ETF") that he had spoofed many times before.

45. At approximately 6:25:00 p.m., the ETF showed an NBB of $61.58 per share and an NBO of $62.04 per share, for an NBBO spread of $0.46. (For comparison, during regular market hours on January 10, 2025, the average NBBO spread in this ETF was $0.010229.) From 6:25:46 to 6:30:30 p.m., Cerisano entered nine sell orders in one of the new spoofing accounts (the "BD 2 account") at successively lower prices, totaling 5,600 shares. These orders ultimately lowered the NBO to $61.65. Meanwhile, between 6:26:32 and 6:30:52 p.m., Cerisano entered nine buy orders in another account (the "BD 3 account"); these were filled at an average price of $61.67 on 15,700 shares, after which Cerisano cancelled his remaining sell orders in his BD 2 account, between 6:30:38 and 6:31:03 p.m., allowing the NBO to return to $62.04.

46. Having established a long position in the ETF, Cerisano then manipulated the ETF's share price to exit that position at a profit. At approximately 6:32:00 p.m., the ETF showed an NBB of $61.57 per share and an NBO of $62.04 per share. From 6:32:07 to 6:36:20 p.m. Cerisano entered ten buy orders for the ETF at successively higher prices in his BD 2 account, totaling 5,300 shares, ultimately raising the NBB to $61.87. From 6:34:25 to 6:36:46 p.m., Cerisano entered ten sell orders in his BD 3 account; these were filled at an average price of $61.85 on 15,700 shares. Cerisano then cancelled all the buy orders in his BD 2 account at approximately 6:36:50, except for one buy order at the lowest price tier, which he cancelled at approximately 6:44:05 p.m. After he cancelled that final buy order, the NBB returned to $61.57.

47. Cerisano's trading described in ¶¶ 45-46 generated an illicit profit of approximately $2,884.

48. Cerisano knew or was reckless in not knowing that all of his spoofing activity in the new spoofing accounts amounted to unlawful market manipulation. The multiple admonitions, explanations, and definitions provided by the BD 1 compliance officer unmistakably identified the characteristics of spoofing activity that "regulators," including Plaintiff, would consider unlawful and which was, in fact, unlawful. BD 1's closure of Cerisano's account was an unambiguous signal that manipulative trading was a matter to be taken seriously.

49. Moreover, Cerisano sat for and passed the FINRA Series 7 exam three times from 1988 to 2000. This exam's study materials and the exam itself covered manipulative trading, including spoofing.

50. Cerisano also understood what spoofing was due to his experience as a securities industry professional.

51. During the relevant period, Cerisano received periodic reminders that spoofing was prohibited. From time to time, he did not use the "helper-winner" structure to conduct spoofing, but instead entered both bona fide and non-bona fide

11

orders for a security through a single account. On these occasions, the corresponding broker-dealer detected his conduct and, much like the BD 1 compliance officer had done, sent Cerisano an email describing the violative trading and advising him that this trading appeared to be manipulative or suspicious. These broker-dealers then either warned Cerisano to cease this activity or demanded an explanation for it.

52.    When pressed for an explanation of his spoofing activity, Cerisano routinely told broker-dealer representatives that it would have been impossible for him, as an individual trader with limited capital, to manipulate the price of a large-cap stock that he had traded. This explanation elided the fact that Cerisano's spoofing took place outside of regular market hours, when lower trade volume and correspondingly larger NBBO spreads made stocks more susceptible to price manipulation. It also ignored that his non-bona fide orders accounted for a large percentage of the visible order book for each successful spoofing transaction, irrespective of the subject stock's liquidity or capitalization.

53.    Cerisano knew or was reckless in not knowing that this explanation was false and/or misleading because, each time he provided it, he had already successfully manipulated the prices of multiple large-cap stocks on numerous occasions.

54.    Cerisano engaged in no fewer than 3,000 discrete instances of spoofing over roughly half the trading days during the relevant period. This unlawful trading generated approximately $1,115,672 in profits.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)**

55.    The SEC realleges and incorporates by reference paragraphs 1 through 54 above.

56.    As set forth above, Defendant Cerisano perpetrated a scheme to fraudulently manipulate the prices of securities and conducted his spoofing scheme outside of regular market hours when the securities were more susceptible to

manipulation. He placed multiple non-bona fide spoof orders on one side of the market to move the prices of securities in a direction that benefitted him, then executed bona fide orders on the other side of the market to profit from the price movement and cancelled his spoof orders. He knew, or was reckless in not knowing, that this type of trading was illegal because, among other things, a BD 1 compliance officer had explained to him, multiple times and in ample detail, what spoofing was and that "our regulators" would consider his trading to be manipulative.

57.    By virtue of the foregoing, Cerisano directly or indirectly, by the use of means or instruments of interstate commerce, or of the mails or of a facility of a national securities exchange, in connection with the purchase or sale of a security:

   (a)    Employed one or more devices, schemes or artifices to defraud; and

   (b)    Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

58.    By virtue of the foregoing, Cerisano violated and, unless restrained and enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)] thereunder.

## SECOND CLAIM FOR RELIEF

### Manipulation of Security Prices

### Violation of Section 9(a)(2) of the Exchange Act

59.    The SEC realleges and incorporates by reference paragraphs 1 through 54 above.

60.    As set forth above, Defendant Cerisano perpetrated a scheme to fraudulently manipulate the prices of securities and conducted his spoofing scheme outside of regular market hours when the securities were more susceptible to manipulation. He placed multiple non-bona fide spoof orders on one side of the market to move the prices of securities in a direction that benefited him, then executed bona fide orders on the other side of the market to profit from the price movement and cancelled his spoof orders. He knew, or was reckless in not knowing, that this type of

13

trading was illegal because, among other things, a BD 1 compliance officer had explained to him, multiple times and in ample detail, what spoofing was and that "our regulators" would consider his trading to be manipulative.

61.     By virtue of the foregoing, Cerisano, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected, alone or with one or more other persons, a series of transactions in a security registered on a national securities exchange creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

62.     By virtue of the foregoing, Cerisano violated and, unless restrained and enjoined, will again violate Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)].

### THIRD CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act

63.     The SEC realleges and incorporates by reference paragraphs 1 through 54 above.

64.     As set forth above, Defendant Cerisano perpetrated a scheme to fraudulently manipulate the prices of securities and conducted his spoofing scheme outside of regular market hours when the securities were more susceptible to manipulation. He placed multiple non-bona fide spoof orders on one side of the market to move the prices of securities in a direction that benefitted him, then executed bona fide orders on the other side of the market to profit from the price movement and cancelled his spoof orders. He knew, or was reckless in not knowing, that this type of trading was illegal because, among other things, a BD 1 compliance officer had explained to him, multiple times and in ample detail, what spoofing was and that "our regulators" would consider his trading to be manipulative.

65.     By virtue of the foregoing, Cerisano, directly or indirectly, in the offer or

14

sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

      (a)    Employed one or more devices, schemes or artifices to defraud; and

      (b)    Engaged in one or more transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

66. By virtue of the foregoing, Cerisano violated and, unless restrained and enjoined, will again violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure permanently enjoining Defendant Cerisano and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)]; and Sections 9(a)(2) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### II.

Enter an order against Defendant Cerisano pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(5)], prohibiting him, for a period of five years, from, directly or indirectly, opening, maintaining or trading in any brokerage account(s) in his name, the names of any immediate family members, the name of any company over which he has any control or the name(s) of any third party individuals, without providing the relevant broker-dealer(s) a copy of this complaint and the final judgment entered against him

in this action.

### III.

Order Defendant Cerisano to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), (5), and (7) [15 U.S.C. §§ 78u(d)(3), (5), and (7)].

### IV.

Order Defendant Cerisano to pay a civil penalty under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and Section 21(d)(3) of the of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: August 10, 2026

*/s/ Timothy Work*

Timothy Work
Attorney for Plaintiff
Securities and Exchange Commission